## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MATTHEW GRESS and KYLE MCNEIL, Derivatively on Behalf of ACER THERAPEUTICS INC., <br><br> Plaintiffs, <br><br> v. <br><br> STEVE ASELAGE, CHRIS SCHELLING, MICHELLE GRIFFIN, JOHN M. DUNN, JASON AMELLO, HARRY PALMIN, HUBERT BIRNER, and LUC MARENGERE, <br><br> Defendants, <br><br> and, <br><br> ACER THERAPEUTICS INC., <br><br> Nominal Defendant. | Civil Action No: <br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, by and through their undersigned counsel, derivatively on behalf of Nominal Defendant Acer Therapeutics Inc. ("Acer" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Acer with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Acer against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, unjust enrichment, and violations of § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") that occurred between September 25, 2017 to the present (the "Relevant Period") and have caused substantial harm to Acer.

## JURISDICTION AND VENUE

2.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of sections 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Acer, occurred in this District; and (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

**A.**      **Plaintiffs**

5.      ***Plaintiff Matthew Gress*** is, and was at relevant times, a shareholder of Acer. Plaintiff Gress will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

6.      ***Plaintiff Kyle McNeil*** is, and was at relevant times, a shareholder of Acer. Plaintiff McNeil will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**B.**      **Nominal Defendant**

7.      Nominal Defendant Acer is a Delaware corporation with its principal executive offices located at One Gateway Center, Suite 351, 300 Washington Street, Newton, Massachusetts.  Nominal Defendant Acer is a citizen of the State of Delaware or the State of Massachusetts.

**C.**      **Director Defendants**

8.      ***Defendant Steve Aselage*** ("Aselage") is the Chairman of the Board of Directors ("Board") of the Company.  Defendant Aselage is the Chair of the Compensation Committee. Defendant Aselage is also a member of the Nominating and Governance Committee.  Defendant Aselage is a citizen of California.

9.      ***Defendant Chris Schelling*** ("Schelling") is the Chief Executive Officer ("CEO"), Founder and a Director of the Company.  Defendant Schelling is a citizen of the State of Oregon.

10.      ***Defendant Michelle Griffin*** ("Griffin") is a Director of the Company.  Defendant Griffin is the Chair of the Audit Committee.  Defendant Griffin is also a member of the Compensation Committee.  Defendant Griffin is a citizen of the State of Washington.

11.     **Defendant John M. Dunn** ("Dunn") is a Director of the Company.  Defendant Dunn is a member of the Audit Committee.  Defendant Dunn is also the Chair of the Nominating and Governance Committee.  Defendant Dunn is a citizen of the State of California.

12.     **Defendant Jason Amello** ("Amello") is a Director of the Company.  Defendant Amello is also a member of the Audit Committee.  Defendant Amello is a citizen of the State of Massachusetts.

13.     Defendants Aselage, Schelling, Griffin, Dunn and Amello are herein referred to as the "Director Defendants."

**Former Director Defendants**

14.     **Defendant Hubert Birner** ("Birner") has been has served as a Director of the Company since September 2017.  Since 2000, Birner has served in a variety of roles for TVM Capital, an independent affiliation of international private equity and venture capital firms, where he currently serves as the Managing Partner of TVM Capital and TVM Life Science Management (collectively, "TVM").  TVM owns 26.5% of all the outstanding shares of Acer stock.  Defendant Birner did not stand for reelection to the Board of Directors at Acer's May 17, 2019 Annual Meeting.

15.     **Defendant Luc Marengere** ("Marengere") has been a Director of the Company since September 2017.  Marengere serves as Managing Partner of TVM Life Science Venture VII, L.P., which he joined in March 2012.  TVM owns 26.5% of all the outstanding shares of Acer stock.  Defendant Marengerer did not stand for reelection to the Board of Directors at Acer's May 17, 2019 Annual Meeting.

16.     Defendants Birner and Marengere are herein referred to as the "Former Director Defendants."

**Officer Defendant**

17. ***Defendant Harry Palmin*** ("Palmin") has served as the Company's Chief Financial Officer ("CFO") at all relevant times. Defendant Palmin also served as the Company's Chief Operating Officer since September 1, 2018. Defendant Palmin is a citizen of the State of Massachusetts.

18. The Director Defendants, Former Director Defendants, and Defendant Palmin are collectively referred to herein as the "Defendants."

## DUTIES OF DEFENDANTS

19. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Acer, Defendants owed and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage Acer in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of Acer and its investors.

20. Each defendant of the Company owes to Acer and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

21. To discharge their duties, the officers and directors of Acer were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Acer were required to, among other things:

    (a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    (b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    (c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    (d)    remain informed as to how Acer conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

    (e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

    (f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

22.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Acer, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## AUDIT COMMITTEE CHARTER

23.     The Audit Committee is charged with the following duties:

**IV.     Duties and Powers of the Committee**

To carry out its purposes, the Committee shall have the following duties and powers:

1.     with respect to the independent auditors,

    (i)     to directly appoint, retain, compensate, evaluate, and terminate the independent auditors, including having the sole authority to approve all audit engagement fees and terms, provided that the auditor appointment shall be subject to stockholder approval;

    (ii)     to pre-approve, or to adopt appropriate procedures to pre-approve, all audit and non-audit services to be provided by the independent auditors;

    (iii)     to review and discuss the annual written statement from the independent auditors delineating all of the independent auditors' relationships with the Company (as required by the Public Company Accounting Oversight Board regarding the independent auditors' communications with an audit committee concerning independence) and, based on such review, assess the independence of the auditors;

    (iv)     to discuss with the independent auditors in connection with any audit all critical accounting policies and practices used, all

alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors, and any material written communications between the independent auditors and management, such as any "management letter" or schedule of unadjusted differences and management's responses thereto;

(v) to discuss with management and the independent auditors the timing and process for implementing the rotation of the lead audit partner, the concurring partner and any other active audit engagement team partner;

(vi) to instruct the independent auditors that the independent auditors are ultimately accountable to the Committee, as representatives of the stockholders; and

(vii) to establish guidelines for the hiring of employees and former employees of the independent auditors;

2. with respect to financial reporting principles and policies and internal controls and procedures,

(i) to advise management and the independent auditors that they are expected to provide to the Committee a timely analysis of significant financial reporting issues and practices;

(ii) to consider any reports or communications (and management's responses thereto) submitted to the Committee by the independent auditors, including reports and communications related to:

☐ deficiencies noted in the audit in the design or operation of internal controls;
☐ consideration of fraud in a financial statement audit;
☐ detection of illegal acts;
☐ any restriction on audit scope;
☐ significant accounting policies;
☐ management judgments and accounting estimates;
☐ any accounting adjustments arising from the audit that were noted or proposed by the auditors but were passed (as immaterial or otherwise);
☐ disagreements with management;
☐ difficulties encountered with management in performing the

audit;

☐ the independent auditors' judgments about the quality of the

entity's accounting principles; and

☐ reviews of interim financial information conducted by the independent auditors;

(iii) to meet with management and the independent auditors:

☐ to review and discuss the annual audited financial statements

and quarterly financial statements, including the Company's

disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

☐ to discuss any significant matters arising from any audit, including any audit problems or difficulties, whether raised by management or the independent auditors, relating to the Company's financial statements;

☐ to discuss any difficulties the independent auditors encountered in the course of the audit, including any restrictions on their activities or access to requested information and any significant disagreements with management;

☐ to review the form of opinion the independent auditors propose to render to the Board and stockholders; and

☐ to discuss, as appropriate: (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's disclosure controls and procedures and internal control over financial reporting, and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in

connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company;

(iv) to discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and

control such exposures, including the Company's policies with respect to financial risk assessment and financial risk management;

(v)      to inquire of and review any disclosures made to the Committee by the Company's chief executive officer and chief financial officer (or persons performing such functions) during their certification process for the Company's Form 10-K and Forms 10-Q as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls;

(vi)      to discuss with the Company's general counsel (or person or entity performing such function) any significant legal, compliance or regulatory matters that may have a material effect on the financial statements or the Company's business, financial statements or compliance policies, including material notices to or inquiries received from governmental agencies;

(vii)      to discuss and review the type and presentation of information to be included in earnings press releases;

(viii)      to establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters; and

(ix)      to review and approve where appropriate any proposed "related person transactions" which may be required to be disclosed by the Company (pursuant to Item 404 of Regulation S-K), based on all relevant facts and circumstances reasonably available to the Committee (including, but not limited to: the nature of the related person's interest in the transaction; the material terms of the transaction, including, without limitation, the amount and type of transaction; the importance of the transaction to the related person; the importance of the transaction to the Company; whether the transaction would impair the judgment of a director or executive officer to act in the best interest of the Company; and any other matters the Committee deems appropriate), where approval is given by the Committee only for those transactions it determines are fair to and in the best interests of the Company, taking into account all factors deemed relevant by the Committee;

3.      with respect to reporting and recommendations,

    (i)     to recommend to the Board, based on its review and discussions with management and the independent auditors, whether the Company's audited financial statements should be included in the Company's annual report on Form 10-K;

    (ii)    to prepare any report or other disclosures, including any recommendation of the Committee, required by the rules of the SEC to be included in the Company's annual proxy statement;

    (iii)   to review and reassess the adequacy of this Charter at least annually and recommend any changes to the full Board;

    (iv)    to prepare and review with the Board an annual performance evaluation of the Committee, which evaluation shall compare the performance of the Committee with the requirements of this Charter;

    (v)     to report its activities to the full Board on a regular basis and to make such recommendations with respect to the above and other matters as the Committee may deem necessary or appropriate;

    (vi)    in the case of matters concerning accounting, internal controls or auditing, to monitor compliance with the Company's Code of Ethics and when appropriate, impose and enforce appropriate disciplinary measures for violations of the Code; and

    (vii)   to review any proposed waiver of the Code and make a recommendation to the Board with respect to the disposition of any proposed waiver.

## **BACKGROUND**

24.     The Company is a pharmaceutical company that purportedly focuses on the acquisition, development, and commercialization of therapies for serious rare and life-threatening diseases.  The Company's pipeline includes, *inter alia*, EDSIVO (celiprolol) for the treatment of vascular Ehlers-Danlos syndrome ("vEDS") in patients with a confirmed type III collagen mutation.

25.     vEDS is a rare disease known to cause abnormal fragility in blood vessels,

causing aneurysms, abnormal connections between blood vessels known as arteriovenous fistulas, arterial dissections, and spontaneous vascular ruptures, all of which are potentially life threatening. According to the Company, "[t]he median survival age of vEDS patients in the United States is 51 years, with arterial rupture being the most common cause of sudden death."

26.     In 2004, the French research hospital, Assistance Publique—Hôpitaux de Paris, Hôpital Européen Georges Pompidou ("AP-HP"), published data on vEDS patients.  Based on AP-HP's research, investigators began assessing the preventive effect of celiprolol for major cardiovascular events in patients suffering from vEDS "through a multicenter, prospective, randomized, open trial with blinded evaluation of clinical events" (the "Ong Trial").  The Ong Trial was composed of fifty-three (53) participants "randomized at eight centers in France and one center in Belgium."  The Ong Trial's results were published on October 30, 2010.

27.     On December 13, 2016, Acer Therapeutics Inc. ("Private Acer")—a private Delaware corporation and Acer's predecessor—issued a press release announcing that it had obtained exclusive rights to NDA-enabling clinical data from AP-HP for the use of celiprolol in treating vEDS.  Specifically, Private Acer had signed an agreement with AP-HP, which granted exclusive rights to access and use data from the Ong Trial.  Private Acer announced it would use this data to support its New Drug Application ("NDA") for celiprolol in the treatment of vEDS.

28.     On September 19, 2017, Private Acer announced that it had closed a merger with Opexa Therapeutics, Inc. ("Opexa"), a publicly-traded Texas pharmaceutical corporation, whereby Private Acer survived as a wholly-owned subsidiary of Opexa (the "Opexa Merger"). Following the Opexa Merger, Opexa changed its name to Acer Therapeutics Inc. and Private Acer's management took control of the combined company.  Immediately prior to the Opexa Merger, Opexa's Board of Directors and Neil K. Warma ("Warma"), Opexa's then-President,

Chief Executive Officer ("CEO"), Acting Chief Financial Officer, and Secretary, resigned.

29.     On September 21, 2017, the Company began trading on the NASDAQ under the ticker symbol "ACER."

30.     On April 9, 2018 Defendants caused the Company to file its Notice of Annual Meeting of Shareholders to be held on May 14, 2018 on Form DEF 14A with the SEC (the "2018 Proxy Statement").  Accompanying the 2018 Proxy Statement was Acer's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K").  The 2018 Proxy Statement asked Plaintiffs and other Acer shareholders to vote on (and including but not limited to): (1) election of directors, (2) approve Acer's reincorporation in Delaware, and (3) approve the Acer 2018 Stock Incentive Plan.  The Audit Committee report was included in the 2018 Proxy Statement.  Neither the Audit Committee Report or the 2018 Proxy Statement mentioned EDVISO, vEDS, or disclosed any significant deficiencies or material weaknesses in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

31.     On December 26, 2018, the Company announced that the U.S. Food and Drug Administration ("FDA") had accepted the Company's NDA for EDSIVO for the treatment of vEDS in patients with a confirmed type III collagen mutation, as well as the FDA's grant of priority review of the NDA and an assigned Prescription Drug User Fee Act ("PDUFA") target action date of June 25, 2019.

32.     Throughout the Relevant Period, Defendants caused the Company to make materially false and misleading statements regarding the Company's business, operational and

compliance policies.  Specifically, Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) Acer lacked sufficient data to support filing EDSIVO's NDA with the FDA for the treatment of vEDS; (ii) the Ong Trial was an inadequate and ill-controlled clinical study by FDA standards, and was comprised of an insufficiently small group size to support EDSIVO's NDA; (iii) consequently, the FDA would likely reject EDSIVO's NDA; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

33.    On June 25, 2019, Defendants caused the Company to issue a press release entitled *Acer Therapeutics Receives Complete Response Letter from U.S. FDA for use of EDSIVO™ (celiprolol) in vEDS Patients* (the "June 2019 Press Release").  In the June 2019 Press Release, the Company disclosed receipt of a Complete Response Letter ("CRL") from the FDA regarding its NDA for EDSIVO for the treatment of vEDS.  The Company advised investors that "[t]he CRL states that it will be necessary to conduct an adequate and well-controlled trial to determine whether celiprolol reduces the risk of clinical events in patients with vEDS" and that "Acer plans to request a meeting to discuss the FDA's response."

34.    That same day, news sources reported that the small group size of the Ong Trial had raised questions among experts about the adequacy of EDSIVO's trial results.

35.    Following this news, the Company's stock price fell $15.16 per share, or 78.63%, to close at $4.12 per share on June 25, 2019.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

36.    On September 25, 2017, Defendants caused the Company to issue a press release announcing *Positive Results From Pivotal Clinical Trial of EDSIVO* for the treatment of vEDS (the "September 2017 Press Release").  Despite the Ong Trial's small group size of only fifty-

three (53) participants, the September 2017 Press Release touted the Ong Trial as a

comprehensive study with positive results that would support the Company's NDA for EDSIVO,

stating, in relevant part:

> Acer's retrospective source verified analysis of the trial data, including the
> primary and secondary endpoints, confirmed the data from a previously published
> randomized controlled clinical study of celiprolol (1). Acer will use this pivotal
> clinical data to support a New Drug Application (NDA) regulatory filing in the
> U.S. in the first half of 2018.
>
>           \*  \*  \*
>
> The previously completed European study, published on October 30, 2010, in The
> Lancet, was stopped early having achieved statistical significance in its primary
> endpoints, with arterial dissection or rupture affecting 5 (20%) celiprolol patients
> and 14 (50%) subjects in the non-treated control group (hazard ratio [HR] 0.36;
> pvalue 0.04). The combined primary and secondary endpoints of intestinal or
> uterine rupture affected 6 (24%) celiprolol patients and 17 (61%) subjects in the
> non-treated control group (HR 0.31; p-value 0.01). The study was conducted in 53
> patients, who were randomly assigned either a twice daily treatment of celiprolol
> or no treatment. Mean duration of follow-up was 47 months prior to trial halt.

37.     The September 2017 Press Release also included a statement by Pierre

Boutouyrie ("Boutouyrie") M.D., Ph.D., co-director of the clinical pharmacology service at AP-

HP, and Principal Investigator for the published celiprolol study.  Boutouyrie touted "nearly two

decades" worth of data obtained on EDSIVO in vEDS patients and that the drug was the

"standard of care" for vEDS patients in France.  Specifically, Boutouyrie stated:

> We have studied celiprolol for nearly two decades in vEDS patients and this is the
> only drug to ever demonstrate a clinical benefit in this difficult to treat patient
> population in a randomized, controlled clinical study . . . . Having established
> celiprolol as the standard of care in France for vEDS patients, we are excited to
> collaborate with Acer to help bring celiprolol to U.S. patients who are suffering
> from this devastating, life-threatening disease.

38.     Additionally, the September 2017 Press Release included a statement by the

Company's Chief Medical Officer, Robert D. Steiner, M.D., who stressed that the Company had

vetted the Ong Trial data, and that this data was a "critical element" of EDSIVO's NDA:

Our confirmation of the published celiprolol clinical data with an Acer-sponsored retrospective source verified analysis of the trial data represents a critical element of the clinical module in our NDA, which we are diligently building, along with current manufacturing, non-clinical and other components of the regulatory package.

39.     Finally, the September 2017 Press Release included a statement by Defendant Schelling, who touted the Ong Trial as a "robust" clinical study with endpoints verified by the Company, which would "rapidly advance" EDSIVO's product development:

We continue to successfully rapidly advance our lead product candidate, EDSIVO™, a potential life-saving therapy for patients with vEDS, towards an NDA filing, which we expect to accomplish in the first half of 2018 . . . .  In addition to source verifying a definitive Event-Free Survival endpoint from a previously completed robust clinical study, modernizing manufacturing and assembling other components of the regulatory package, we are executing on a number of key medical affairs focused initiatives for vEDS patients. Specifically, we are setting up Centers of Excellence to optimize patient care, and intend to develop a prospective vEDS Patient Registry and provide integrated care support programs.

40.     On March 7, 2018, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 Form 10-K").   Under the 2017 Form 10-K's "Rationale for EDSIVO™ Treatment in vEDS" section heading, Defendants heavily relied upon the methodology and results of the Ong Trial.

41.     Additionally, under the 2017 Form 10-K's "Registration Plan" section heading for EDSIVO, Defendants touted their meeting with the FDA and indicated that the agency had sanctioned the Ong Trial as a sufficient source of data to support the EDSIVO NDA, stating, in relevant part:

In September 2015, we met with the FDA to discuss the existing clinical data for EDSIVO™.  At that meeting, the FDA agreed that an additional clinical trial is not likely needed and stated that we may submit a 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS. The FDA indicated to us at that time that it expected that the 505(b)(2) NDA for EDSIVO™ is likely to qualify for priority review.

Priority review provides an expedited six-month review cycle after acceptance of the NDA for filing, instead of the traditional ten-month review cycle, for drugs that treat a serious condition and demonstrate the potential to be a significant improvement in safety or effectiveness of the treatment, prevention, or diagnosis of the condition. The FDA determines whether an application will receive priority review at the time the application is accepted for filing.

42.     Additionally, according to the 2017 Form 10-K, the Company had consulted with the FDA regarding potential data gaps that could hinder the Company's EDSIVO NDA filing. According to the 2017 Form 10-K, Defendants had received additional guidance concerning these gaps.  Specifically, the 2017 Form 10-K stated in relevant part:

In May 2017, we held a Type C meeting with the FDA to discuss non-clinical and manufacturing data, and proactively identify whether there were any gaps for us to address in advance of a pre-NDA meeting. In our non-clinical data package, we are addressing a potential preclinical gap by conducting in vitro drug-drug interaction studies, which were missing from the Aventis MHRA dossier. We also reached agreement with the FDA regarding Chemistry, Manufacturing and Controls (CMC) specifications.  Furthermore, the FDA provided us with additional guidance on the expected presentation of the existing clinical data for EDSIVO™ to support the NDA filing.

We plan to have a pre-NDA meeting, which may consist of one or more consults, with the FDA in the second quarter of 2018. Subsequently, we expect to submit the 505(b)(2) NDA for EDSIVO™ for the treatment of vEDS at the end of the first half of 2018.

43.     The 2017 Form 10-K also contained generic, boilerplate representations concerning the risk that regulatory approval for EDSIVO might prove more expensive and time-consuming than Defendants initially anticipated.  For example, the 2017 Form 10-K stated in relevant part:

*Our product candidate EDSIVO™ has not been approved for any indication in the United States, which may result in greater research and development expenses, regulatory issues that could delay or prevent approval, or discovery of unknown or unanticipated adverse effects*.

EDSIVO™ is a repurposing of celiprolol for the treatment of vEDS. An NDA for this drug in the treatment of hypertension was submitted to the FDA in 1987, however, the NDA was withdrawn prior to review. However, the drug has been

approved in Europe for the treatment of hypertension since 1984. Regulatory approval of EDSIVO™ may be more expensive and take longer than for other, more well-known or extensively studied pharmaceutical product candidates due to our and regulatory agencies' lack of experience with celiprolol. The novelty of this product candidate may lengthen the regulatory review process, require us to conduct additional studies or clinical trials, increase our development costs, lead to changes in regulatory positions and interpretations, delay or prevent approval and commercialization of our product candidates or lead to significant postapproval limitations or restrictions. There is also an increased risk that we may discover previously unknown or unanticipated adverse effects during our clinical trials and beyond. Any such events could adversely impact our business prospects, financial condition and results of operations. (Emphasis in original.)

44.     Additionally, the 2017 Form 10-K contained generic, boilerplate representations concerning the risk that the Company's stock price could suffer dramatic changes due to, *inter alia*, "the development status of any of [the Company's] drug candidates, such as EDSIVO™[.]" Appended as exhibits to the 2017 Form 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Schelling and Palmin certified that "[t]he [2017 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in the [2017 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

45.     On October 29, 2018, Defendants caused the Company to issue a press release announcing the Company's submission of its NDA for EDSIVO to the FDA for the treatment of vEDS (the "October 2018 Press Release").   The October 2018 Press Release contained a statement by William Andrews ("Andrews"), M.D., FACP, Chief Medical Officer of Acer. Andrews's statement acclaimed EDSIVO's NDA as the culmination of the "extensive efforts" of, *inter alia*, the Company's employees and clinical sites, and the Company's continued work with the FDA as the FDA reviewed EDSIVO's NDA.   Specifically, the Andrews' statement in the October 2018 Press Release read:

Our NDA submission represents the culmination of extensive efforts of our employees, investigators, clinical trial sites, contract research organizations, caregivers and patients . . . . We now look forward to continuing to work with the FDA as they review our NDA, with hopes to make EDSIVO™ available as quickly as possible in the U.S. We are grateful to the vEDS patient and advocacy community for their continued involvement, support and feedback as we work together to advance EDSIVO™, which has the potential to be a significant step forward in the care of patients with this devastating disease.

46.     On December 26, 2018, Defendants caused the Company to issue a press release announcing the FDA's acceptance of, and grant of priority review for, the EDSIVO NDA (the "December 2018 Press Release").  The December 2018 Press Release boasted that the FDA's grant of priority review for EDSIVO's NDA indicated that EDSIVO "offer[ed] a significant improvement in treatment or provide[d] treatment where no satisfactory alternative therapy exists."

47.     The December 2018 Press Release also included a statement by Andrews, again acclaiming EDSIVO's NDA, this time as the product of the Company's "hard work, passion and complete dedication[,]" which the Company would continue to exert alongside the FDA as EDSIVO's NDA was reviewed by the FDA.  Specifically, Andrews' statement in the December 2018 Press Release read:

The acceptance of our NDA for EDSIVO™ is an important step in our efforts to help patients with vEDS, who suffer with a devastating disease that currently has no approved treatment . . . .  We have had the honor of learning about the significant challenges of living with vEDS directly from patients and their families. This has in large part driven the hard work, passion and complete dedication that our small team has given to this effort, and we will continue to do so as the FDA reviews our NDA for EDSIVO™.  We are excited about the possibility of making EDSIVO™ available in the U.S. for patients in the near future.

48.     The December 2018 Press Release also contained a statement by Defendant Schelling, which touted the Company's "accelerat[ion]" of "pre-commercial activities" to launch EDSIVO in the United States.  Specifically, Defendant Schelling's statement in the December

2018 Press Release read:

> We continue to accelerate our pre-commercial activities supporting the potential U.S. launch of EDSIVO™ for the treatment of vEDS if it is approved by the FDA . . . .  Additionally, we are working diligently on advancing and expanding our pipeline with the goal of bringing multiple products to patients with serious rare diseases over the next several years.

49.     On March 7, 2019, Defendants caused the Company to file an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2018 (the "2018 Form 10-K").  Under the 2018 Form 10-K's "Rationale for EDSIVO™ Treatment in vEDS" section heading, Defendants again heavily relied upon the methodology and results of the Ong Trial.  Under the 2018 Form 10-K's "Registration Plan" section heading for EDSIVO, Defendants touted the FDA's acceptance of EDSIVO's NDA for priority review, which purportedly meant that EDSIVO "offer[ed] a significant improvement in treatment or provide[d] treatment where no satisfactory alternative therapy exists."  Under the same section heading, Defendants touted "a manuscript for the Paris (AP-HP) vEDS patient registry data" that was "submitted for publication in a top-tier cardiology journal" and currently under peer review.  According to the 2018 Form 10-K, "[i]f published, [Defendants would] submit the manuscript to the FDA for review as part of our NDA and as supplemental data to the Ong trial."

50.     The 2018 Form 10-K also contained nearly identical and substantively the same merely generic, boilerplate representations as the 2017 Form 10-K, above.

51.     Finally, the 2018 Form 10-K touted the risk profile of its drug candidates, stating in relevant part:

> Our product candidates are believed to present a comparatively de-risked profile, having one or more of a favorable safety profile, clinical proof-of-concept data, mechanistic differentiation, and an accelerated path for development, which may include utilizing expedited programs (such as Priority Review) established by the

FDA and/or using the regulatory pathway established under section 505(b)(2) of the Federal Food, Drug and Cosmetic Act ("FFDCA") that allows an applicant to rely at least in part on third-party data for approval, which may expedite the preparation, submission, and approval of a marketing application.

52.    Appended as exhibits to the 2018 Form 10-K were signed SOX certifications wherein Defendants Schelling and Palmin certified that "[t]he [2018 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

53.    The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) Acer lacked sufficient data to support filing EDSIVO's NDA with the FDA for the treatment of vEDS; (ii) the Ong Trial was an inadequate and ill-controlled clinical study by FDA standards, and was comprised of an insufficiently small group size to support EDSIVO's NDA; (iii)  consequently, the FDA would likely reject EDSIVO's NDA; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

54.    On June 25, 2019, Defendants caused the Company to issue the June 2019 Press Release, disclosing that the FDA had rejected the Company's NDA for EDSIVO.  The June 2019 Press Release cited the need for an "adequate and well-controlled trial" evaluating EDSIVO's effectiveness in reducing the risk of clinical events in patients with vEDS.  Specifically, the June 2019 Press Release stated in relevant part:

Acer Therapeutics Inc. (Nasdaq: ACER), a pharmaceutical company focused on

the acquisition, development and commercialization of therapies for serious rare and life-threatening diseases with significant unmet medical needs, today announced it has received a Complete Response Letter (CRL) from the U.S. Food and Drug Administration (FDA) regarding its New Drug Application (NDA) for EDSIVO™ for the treatment of vascular Ehlers-Danlos syndrome (vEDS). ***The CRL states that it will be necessary to conduct an adequate and well-controlled trial to determine whether celiprolol reduces the risk of clinical events in patients with vEDS. Acer plans to request a meeting to discuss the FDA's response.***

"We remain committed to working closely with the FDA to fully understand its response," said Chris Schelling, CEO and Founder of Acer.   "We expect to respond to the FDA in the third quarter of this year." (Emphasis added.)

55.     That same day, *Reuters* published an article titled "FDA declines to approve Acer Therapeutics' rare genetic disorder treatment" (the "*Reuters* Article").  In discussing the FDA's rejection of the Company's FDA, the *Reuters* Article noted, among other things, how "[t]he small group size" of the Ong Trial had "raised questions among experts about the adequacy of the trial results."

56.     Following this news, the Company's stock price fell $15.16 per share, or 78.63%, to close at $4.12 per share on June 25, 2019.

57.     On July 5, 2019 Acer filed a Form 8-K with the SEC and issued a press release and announced a corporate restructuring initiative which included a reduction of approximately 60% of its full-time workforce of 48 employees (reduced to 19) and a halt of pre-commercial activities for EDSIVO™ in light of the Complete Response Letter ("CRL") received from the FDA regarding its NDA for EDSIVO.

58.     On this news and on July 5, 2019, the Company's stock price fell from its opening of $3.69 to close at $3.41.

59.     On August 5, 2019 Acer filed a Form 8-K with the SEC disclosing that the Company hosted a conference call and webcast on July 31, 2019 to discuss a detailed update on

each of its pipeline programs and attached its Pipeline Update Presentation.  In this presentation Acer acknowledged the CRL and stated that it is working to "…determine the optimal path forward".  In this presentation Acer listed the EDSIVO "CRL and Next Steps" as follows:

- Submit a Type A meeting request, to make sure we fully understand the FDA's thought process for the CRL

- Depending on outcome, consider submission of a Formal Dispute Resolution Request (FDRR)

- Depending on Issues and outcomes, we may be able to resubmit our NDA, but no assurances

- The entire process will likely take many months and possibly a year or more to reach final outcome

- We will provide updates as appropriate and may discontinue the process at any point where risk/benefit no longer justifies continued resources

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

60.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

61.     Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

62.     Plaintiffs are current owners of Acer stock.  Plaintiffs understands their obligation to hold stock throughout the duration of this action and are prepared to do so.

63.     During the wrongful course of conduct at the Company, the Board consisted of the Director Defendants and Former Director Defendants.   Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

64.     The Acer Board is currently comprised of Defendants Aselage, Schelling, Griffin, Dunn, and Amello.   Thus, Plaintiffs are required to show that a majority of the Demand Defendants, *i.e.*, three (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

65.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

66.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

67.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.   For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

68.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

69.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or

permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

70.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.

71.    Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**<u>Defendant Schelling</u>**

72.    Defendant Schelling is not disinterested or independent, and therefore, is incapable of considering demand because Schelling (as CEO of the Company) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Schelling cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

73.    This lack of independence and financial benefits received by Defendant Schelling renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

74.    In addition, Defendant Schelling is a defendant in the securities class action entitled *Sell v. Acer Therapeutics, Inc., et al.*, Case 1:19-cv-06137 (S.D.N.Y.) ("Securities Class Action").

75.    As such, Defendant Schelling cannot independently consider any demand to sue

himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendants Griffin, Amello and Dunn**

76.     Defendants Griffin, Amello, and Dunn are members of the Company's Audit Committee.

77.     Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, inquiring of and reviewing "any disclosures made to the Committee by the Company's chief executive officer and chief financial officer (or persons performing such functions) during their certification process for the Company's Form 10-K and Forms 10-Q as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls."

78.     Defendants Griffin, Amello, and Dunn, and during the times each served on this committee, breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  Therefore, Defendants Griffin, Amello, and Dunn face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## **DAMAGE TO THE COMPANY**

79.     Defendants' faithless acts and omissions, breaches of fiduciary duty and

violations of the federal securities laws and state law have severely damaged, and will continue to damage, Acer.  By engaging in the aforementioned unlawful scheme, Defendants: (i) caused Acer to issue materially false and misleading statements to its shareholders and the investment community; (ii) caused Acer common stock to trade at artificially inflated prices, exposing the Company to millions of dollars in potential civil, regulatory and criminal liability to investors and regulators, including the SEC; and (iii) exposed Acer to tens of millions of dollars in legal and accounting fees to investigate this misconduct and to defend the Company in expensive to defend regulatory investigations and shareholder litigation.

80.     Moreover, these actions, have irreparably damaged the Company's goodwill and reputation.  For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## FIRST CAUSE OF ACTION

### (Against Defendants and Defendants for Breach of Fiduciary Duties)

81.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

82.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

83.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

84.     Defendants engaged in a sustained and systematic failure to properly exercise

their fiduciary duties.  In breach of their fiduciary duties owed to Acer, Defendants failed to disclose that: (i) Acer lacked sufficient data to support filing EDSIVO's NDA with the FDA for the treatment of vEDS; (ii) the Ong Trial was an inadequate and ill-controlled clinical study by FDA standards, and was comprised of an insufficiently small group size to support EDSIVO's NDA; (iii) consequently, the FDA would likely reject EDSIVO's NDA; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

85.     Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

86.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

87.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment)

88.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

89.     As a result of the conduct described above, Defendants have been unjustly enriched at the expense of the Company.

90.     Further, Defendants received tens of thousands of dollars in cash bonuses and equity incentive compensation by causing Acer to issue materially false and misleading statements to the investment community that exposed it to millions of dollars in potential liability to investors and regulators.  Defendants should be required to disgorge the gains which they obtained and/or will otherwise unjustly obtain at the expense of the Company.  A constructive trust for the benefit of the Company should be imposed thereon.

91.     All the stock sales proceeds and cash bonus and equity compensation payments provided to Defendants were at the expense of the Company.  The Company received no benefit from these stock sales proceeds and payments.  The Company was damaged by such stock sales proceeds and payments.

92.     Plaintiffs, as shareholders and representatives of the Company, seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, as a result of their wrongful conduct and fiduciary breaches.

### **THIRD CAUSE OF ACTION**

### **(Against Defendants for Violations of Section 14(a) of the Exchange Act)**

93.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

94.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

95.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78I of this title."

96.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

97.     In the exercise of reasonable care, Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading as those statements pertain to the Acer Therapeutics Inc. 2018 Stock Incentive Plan.   Proposal 4 of the Proxy states:

**PROPOSAL 4**

**APPROVAL OF THE 2018 STOCK INCENTIVE PLAN**

We are asking our shareholders to approve our 2018 Stock Incentive Plan (the "2018 Plan") at the Annual Meeting.  On March 1, 2018, the Board approved the 2018 Plan, subject to shareholder approval. If this Proposal 4 is approved and the 2018 Plan becomes effective, no further grants will be made under the Amended and Restated 2010 Stock Incentive Plan (the "2010 Plan") and the 2013 Stock Incentive Plan, as amended (the "2013 Plan"), of Private Acer which we assumed in the merger on September 19, 2017.  All outstanding stock awards granted under the 2010 Plan and the 2013 Plan will continue to be subject to the terms and conditions as set forth in the agreements evidencing such stock awards and the terms of the 2010 Plan or the 2013 Plan, as applicable.

If our shareholders approve the 2018 Plan, the total number of shares of our common stock reserved for issuance under the 2018 Plan will initially consist of (i) 500,000 shares plus (ii) the number of shares subject to outstanding awards under the 2010 Plan and the 2013 Plan that are forfeited or terminate prior to exercise or settlement and would otherwise be returned to the share reserve under the 2010 Plan or the 2013 Plan, as applicable, plus the number of shares subject to vesting restrictions under the 2010 Plan or the 2013 Plan that are subsequently forfeited, plus any reserved shares not issued or subject to outstanding grants, up to a maximum of 635,170 shares. In addition, the number of shares that have been authorized for issuance under the 2018 Plan will be automatically increased on the first day of each fiscal year beginning on January 1, 2019 and ending on (and including) January 1, 2028, in an amount equal to the lesser of (i) 4% of the outstanding shares of our common stock on the last day of the immediately preceding fiscal year, or (ii) another amount (including zero) determined by our Board of Directors ("Board").

**Why You Should Vote for Approval of our 2018 Stock Incentive Plan**

*Equity Awards Are an Important Part of Our Compensation Philosophy*

The 2018 Plan is critical to our ongoing effort to build shareholder value. Equity incentive awards are central to our compensation program. Our Compensation Committee and Board believe that our ability to grant equity incentives to new and existing employees has helped us attract, retain and motivate key talent. For example, since the potential value of stock options is realized only if our share price increases, this form of compensation provides a strong incentive for employees to work to grow the business and build shareholder value, and is most attractive to employees who share the entrepreneurial spirit that we believe is key to making our company a success.

The 2018 Plan will also provide us with continued flexibility in designing equity incentives in an environment where a number of companies have moved from traditional option grants to other stock awards, including restricted stock awards, stock appreciation rights, restricted stock unit awards, performance stock awards and performance cash awards. Accordingly, the 2018 Plan will allow us to utilize a broad array of equity incentives in order to secure and retain the services.

*Our 2010 Plan is Running Low on Shares and our 2013 Plan Share Reserve has been Depleted*

Grants of equity awards to our employees, consultants, executive officers and directors are currently made only from the 2010 Plan. All available shares under the 2013 Plan are currently subject to outstanding awards and no further awards may be made thereunder. After carefully forecasting, we anticipate that the 2010 Plan will not have any remaining shares in its share reserve by the end of the

second quarter of 2018, and we will not be able to issue equity to our employees, consultants, executive officers and directors unless our shareholders approve a new stock plan. While we could increase cash compensation if we are unable to grant equity incentives, we anticipate that we will have difficulty attracting, retaining, and motivating our employees, consultants, executive officers and directors if we are unable to make equity grants to them. Stock incentive awards are a more effective executive compensation vehicle than cash at a growth-oriented, entrepreneurial company because they deliver high potential value with a smaller impact on current income and cash flow. Therefore, we are asking our shareholders to approve the 2018 Plan

98.     The misrepresentations and omissions were material to Plaintiffs in voting on the matter as to whether to approve the Acer Therapeutics Inc. 2018 Stock Incentive Plan set forth for stockholder determination in the 2018 Proxy Statement, including but not limited to, the election of directors.

99.     The Company was damaged as a result of Defendants material misrepresentations and omissions in the 2018 Proxy Statement.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


DATED: August 12, 2019

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (#4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

*Attorneys for Plaintiffs*

**OF COUNSEL**:

**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com